AO 94 (Rev. 11/11) Criminal Complaint AUSA Stephen Chahn Lee (312) 353-4127

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LYLE ANASTOS | CASE NUMBER:<br><br>**16CR 646**<br><br>MAGISTRATE JUDGE GILBERT |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about October 4, 2016, at approximately 12:41 p.m., in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1958 | used a facility of interstate commerce, namely, a cell phone, with the intent that a murder be committed in violation of the laws of the State of Illinois as consideration for a promise or agreement to pay anything of pecuniary value, in violation of Title 18, United States Code, Section 1958 |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

*[signature]*
JODY BLAU
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: October 5, 2016

*[signature]*
*Judge's signature*

City and state: Chicago, Illinois

JEFFREY T. GILBERT, U.S. Magistrate Judge
*Printed name and Title*

**FILED**
OCT 05 2016
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1

| | |
|---|---|
| UNITED STATES DISTRICT COURT | ) |
| | ) ss |
| NORTHERN DISTRICT OF ILLINOIS | ) |

## AFFIDAVIT

I, Jody Blau, being duly sworn, state as follows:

### I. BACKGROUND OF AFFIANT

1. I am a Special Agent with the Federal Bureau of Investigation. I have been so employed for approximately eight years.

2. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to white collar crime, including wire and mail fraud. Through my training and experience, I have become familiar with the methods by which individuals and entities conduct and participate in fraud schemes and the tools used in the investigation of such violations, including consensual monitoring, surveillance, data analysis, and conducting interviews of witnesses, informants, and others who have knowledge of fraud schemes. I have participated in the execution of multiple federal search warrants. Along with other federal agents, I am responsible for the investigation of LYLE ANASTOS, described further herein.

### II. BASIS AND PURPOSE OF AFFIDAVIT

3. This affidavit is submitted in part for the limited purpose of establishing probable cause to support a criminal complaint charging that on October 4, 2016, at approximately 12:41 p.m., LYLE ANASTOS used a facility of interstate commerce, namely, a cell phone, with the intent that a murder be committed in violation of the laws of the State of Illinois as consideration

1

for a promise or agreement to pay anything of pecuniary value, in violation of Title 18, United States Code, Section 1958.[1]

4. The statements in this affidavit are based on my personal knowledge, and on information that I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purposes set forth above, I have not included each and every fact known to me concerning this investigation. Portions of this affidavit are based on draft, not final, transcripts and translations of recordings made by an individual cooperating with law enforcement. At various places in this affidavit, I have included my interpretations of statements and documents, which are marked with brackets and which are based on my knowledge of the investigation, including interviews of witnesses, as well as my training and experience.

5. As discussed below, ANASTOS has had multiple conversations with a cooperating source (the "CS") regarding having the CS help ANASTOS hire someone to kill one or more individuals. The CS voluntarily reported ANASTOS' request for the murder-for-hire to the Federal Bureau of Investigation in Indiana in September 2016.[2] At the direction of law

---

[1] Under Illinois law, 720 ILCS 5/9-1, a person who kills an individual without lawful justification commits the crime of first degree murder if, in performing the acts, which cause the death, intends to kill to that individual or another person, or knows that such acts will cause death to that individual or another. Under 720 ILCS 5/8-1.2, a person commits the offense of solicitation of murder for hire when, with the intent that the offense of first-degree murder be committed, he procures another to commit that offense pursuant to any contract, agreement, understanding, command, or request for money or anything of value. Under 720 ILCS 5/8-4, a person commits the offense of attempt when, with the intent to commit a specific offense, he does any act that constitutes a substantial step toward the commission of that offense.

[2] The CS is cooperating in the hopes of receiving considering in terms of his pending cases and with regards to uncharged criminal conduct. The CS has multiple pending cases, including cases on theft charges and deceptive practice charges in Will County and Cook County. The CS has multiple prior convictions and sentences, including: (a) convictions in November 2010 for a 2010 case involving theft/deception and a 2008 case involving theft/deception, for which he received a sentence of three years' imprisonment, (b) convictions in December 2007 for deceptive practices and theft labor/services, for which he received

enforcement, the CS then had multiple recorded conversations in September and October 2016 with ANASTOS. In those recorded conversations, ANASTOS explained that he wanted to pay someone to kill Individual C, an attorney who represents Individual B (a relative of ANASTOS) and who has filed multiple cases against ANASTOS on behalf of Individual B. According to court records, one of the cases filed by Individual C on behalf of Individual C has resulted in a judgment of approximately $902,127 against ANASTOS, ANASTOS' wife, and two companies controlled by ANASTOS.

6. As discussed below, ANASTOS had multiple recorded conversations with the CS on October 4, 2016, both in-person and while ANASTOS was using a cell phone. In one meeting, ANASTOS gave the CS title to a trailer as collateral for his promise to pay the alleged hit man to kill Individual C and said that he understood that Individual C would be killed following that meeting. ANASTOS was then taken into custody. As discussed below, ANASTOS waived his *Miranda* rights and admitted that he had asked the CS to find someone to kill Individual C and that he had provided the title as collateral on his payment for that killing.

### III. BACKGROUND

7. According to a Linkedin profile found online, ANASTOS is the president of Skyline 1, Inc. and is in the real-estate industry. In an interview on October 4, 2016, as further discussed below, ANASTOS said that he was the president of Skyline 1, Inc.

8. According to the Illinois Secretary of State corporation database available online, Skyline 1 Inc. was incorporated in May 2011 and was not in good standing as of October 2016.

---

sentences of 10 days' imprisonment, and (c) a 2006 conviction for a deceptive practice, for which he received a sentence of 6 months' restitution. The CS has also acknowledged issuing bad checks during debriefings with the government. No promises have been made to the CS at this time regarding his status.

Illinois Secretary of State records identify Skyline 1 Inc.'s president as ANASTOS and its secretary as Individual A. According to the same database, Skyline 1 Property Management, Inc was incorporated in June 2011 and was dissolved as of October 2016. Its president is listed as ANASTOS.

9. According to the Cook County clerk's docket, on June 9, 2016, Individual C filed a civil complaint on behalf of Individual B(2016L050381). The complaint attached as an exhibit a demand note in which ANASTOS and others agreed to pay on demand to Individual B $880,000 plus interest and attorney's fees. The demand note appears to have been signed by ANASTOS personally as well as in his capacity as president of Skyline 1, Inc. and as manager of another entity, S12 LLC. The demand note also appears to have been signed by Individual A, who was identified in the demand note as the wife of ANASTOS. According to the demand note, repayment was secured by a collateral agreement covering 13 properties, including: (1) a property located on the 5300 block of West Oakdale Drive, Oak Lawn, which was also listed as the mailing address for ANASTOS and Individual A, and (2) a property located on the 9600 block of South Troy Street, Evergreen Park, Illinois (the "Evergreen Park Property").[3]

---

[3] A complaint relating to the Evergreen Park Property was filed in the Circuit Court of Cook County on July 19, 2016 against ANASTOS, Skyline 1, Inc. and others. According to the complaint, ANASTOS agreed with a limited liability company (the "LLC") that ANASTOS would locate a parcel of real estate that the LLC would pay Skyline 1 to acquire and rehabilitate, and the LLC paid $80,000 to acquire and renovate the Evergreen Park Property in 2012. According to the complaint, ANASTOS did not provide the deed for the Evergreen Park Property until 2014, when he sent a deed that appeared to convey the Evergreen Park Property to the LLC. The deed was never recorded with the Cook County Recorder of Deeds. According to the complaint, two of the LLC's principals met with ANASTOS in August 2015. According to the complaint, "after it was suggested that legal action would be taken against [ANASTOS] and [Skyline 1 Inc], ultimately [ANASTOS] confessed" that ANASTOS "took out mortgages on many properties including the [Evergreen Park Property] … in order to purchase additional properties" and that ANASTOS "stole the rents to pay the interest payments."

4

10. On June 13, 2016, Cook County Circuit Court Judge Carl Anthony Walker entered judgments in the amount of $908,172.72 for Individual B against ANASTOS, Individual A, Skyline 1, Inc., and S12 LLC, representing the $880,000 amount plus interest and attorney's fees.

11. On June 21, 2016, citations to discover assets were filed in the Circuit Court of Cook County. These citations sought information from ANASTOS and Individual A, including information regarding each person's employment, sources of income, liabilities, and ownership of assets and property. Citations seeking information from banks were also filed.

12. On July 18, 2016, Cook County Circuit Judge Alexander White entered orders continuing the citations against ANASTOS and Individual A to September 13, 2016, and dismissing two citations seeking information from banks without prejudice.

13. On September 12, 2016, a motion was filed on behalf of Individual B stating that ANASTOS had sold a property located in Michigan and retained the proceeds of the sale. The motion sought turnover of such funds.

14. On September 13, 2016, Cook County Circuit Court Judge Alexander White entered an order granting Individual B's motion for turnover of funds and ordering ANASTOS to turnover funds in the amount of approximately $227,636 from the sale of a property located in Michigan. Judge White also entered orders directing ANASTOS and Individual A to appear in court on October 17, 2013 and to "to show cause, if any, why he/she should not be held in civil contempt of court … for his/her failure to appear before this court on Sept. 13, 2016, to answer and respond to a Citation to Discover Assets heretofore served as provided by law."

**IV. MURDER-FOR-HIRE SCHEME**

15. On September 12, 2016, an individual ("the CS") came to an FBI office in Indiana. According to the CS, ANASTOS had requested the CS's assistance in locating an individual to

5

murder Individual C. After the meeting with law-enforcement officials in Indiana, the CS turned himself in on pending fraud charges in Lake County, Indiana. The CS was then detained on those charges in the custody of the Lake County jail until extradited to the Will County Jail on or about September 23, 2016.

16. On September 22, 2016, law enforcement met with the CS in the Lake County Jail in Crown Point, Indiana. According to the CS, he first met ANASTOS in early 2015 when the CS was trying to rent some property. According to the CS, ANASTOS wanted the CS to invest $150,000 with ANASTOS, but the CS concluded that the proposed investment was a Ponzi scheme and did not invest.

17. According to the CS, in April 2016, ANASTOS said that he was in a bind and needed to borrow $200,000. The CS said that he contacted Individual C and explained that ANASTOS was trying to borrow money. According to the CS, Individual C advised the CS not to lend money to ANASTOS because ANASTOS already owed Individual B $2 million. According to the CS, Individual C also said that ANASTOS was engaged in a scheme in which he sold the same property to two different people.

18. According to the CS, in July 2016, ANASTOS contacted the CS and asked if the CS could use the CS's family's mob connections to pay someone to kill Individual B and Individual C. The CS informed law enforcement that he declined to do so.

19. According to the CS, in August 2016, ANASTOS contacted the CS and again asked the CS for someone to kill Individual B and Individual C. According to the CS, ANASTOS also wanted to add another person to the list of people he wanted to have killed.

20. According to the CS, the CS lent money to ANASTOS to help with a construction project, and ANASTOS owes the CS approximately $60,000.[4]

21. After further debriefing the CS, law enforcement instructed the CS to have further contact with ANASTOS and to record all such contacts.[5] At the time, the CS was in the custody of law enforcement in Lake County, Indiana and was awaiting extradition to Will County, Illinois. An FBI agent spoke with a prosecutor handling the CS's case in Will County. During that conversation, the FBI agent informed the prosecutor about the CS's on-going cooperation. The FBI agent told the prosecutor that if the CS were to be released from Will County jail, the CS would be able to record a conversation with the subject of the investigation. The Will County State's Attorney Office informed the court there that it was not seeking additional bond beyond what had already been posted on the CS's behalf.

A.  **September 23, 2016 Meeting**

22. On September 23, 2016, agents saw ANASTOS enter the Will County Jail. Agents then saw ANASTOS leave the Will County Jail with the CS, saw ANASTOS and the CS enter a Chevy truck, and saw ANASTOS drive away from the Will County Jail with the CS in the truck.

23. Prior to the September 23, 2016 meeting between ANASTOS and the CS, agents equipped the CS with a recording device and activated it. Agents also told the CS to talk to

---

[4] When interviewed on October 4, 2016, as discussed below, ANASTOS said that he had lent money to the CS, including money to post for the CS's bond in one of his pending cases, and that the CS owed ANASTOS approximately $40,000.

[5] The CS told law enforcement that he had an unrecorded contact with ANASTOS during the time that he was cooperating, that he received money from ANASTOS during that meeting, and that the money was payment towards ANASTOS' debt to the CS. When interviewed on October 4, 2016, as discussed below, ANASTOS said that he had met recently with the CS and given him money, and that the money was a loan to the CS.

ANASTOS about an alleged hit man whom the CS would claim to know and who could be hired by ANASTOS to kill people. After the meeting, agents met with the CS, de-activated the recording device, and obtained it. The following is based on a review of the recording and a draft transcript of the recording.

24. According to the recording, after some conversation on unrelated topics, ANASTOS said, "Yeah, dude, as you know, it's just been a stressful going." ANASTOS referred to him and the CS getting together with "the boys." The CS then said, "Speaking of, of, uh, speaking of boys, that, that conversation that we had you know with [Individual C, referred to by the first name] and [Individual B, referred to by the first name]." ANASTOS replied, "Yeah, fill me in." The CS said, "Uh, well, I don't know I mean, are you still interested in, you know, having, having him killed or what?" ANASTOS replied, "I'm interested."

25. According to the recording, ANASTOS continued, "Got a few little what's called stipulations. One, the deeds have to be transferred before obviously." ANASTOS continued, "In the event that these guys unleashing on me for a week now." Based on my knowledge of the investigation, I believe this is a reference to the citations and motions in the case that was filed by Individual B and that is pending in the Circuit Court of Cook County, Law Division. As noted above, approximately 10 days before this meeting, a judge entered orders directing ANASTOS to turnover funds and to show cause why he should not be held in civil contempt for not appearing at a court hearing.

26. According to the recording, ANASTOS continued, "Totally fine with those two [Individual B and Individual C]. I, I'd like to see those two fucking go." The CS replied, "Okay." ANASTOS said, "Fill me in how that doesn't come back to me. I'm mean, I'm sure they'll look

into me, but uh, do they disappear or is walk up, back of the head." The CS said that he would "make an intro to a guy that we use."

27. According to the recording, ANASTOS asked, "Is it expensive?" The CS replied that ANASTOS would probably be looking at "five to ten grand per person and I'm sure he's gonna want a little down stroke up front [in reference to a down payment for the killing]." The CS then asked, "Are you sure you're gonna want him killed? I mean that's one thing you can't turn back on." ANASTOS replied, "I'm totally fine with that. I just can't have anything come back to me."

**B.** **September 30, 2016 Meeting**

28. On September 30, 2016, agents equipped the CS with an audio recording device and transmitter. The recording device allowed agents to monitor the conversations betweem the CS and ANASTOS. Agents then listened to the recording device as the CS went to meet with ANASTOS and followed the CS. After the meeting, agents met with the CS, de-activated the recording device, and took the recording device back into their possession. The following is based on a review of the recording and a draft transcript of the recording.

29. According to the recording, ANASTOS turned the conversation to Individual B, using Individual B's first name, and then Individual C, using Individual C's last name. According to the recording, ANASTOS said that he and the CS had to talk about "them." The CS then referred to "my contact who I have that handles that kind of business," which I understand to be a reference to the hit man allegedly arranged by the CS, and said that the CS's contact "is always on the move and is calling me, asking, is this fucking guy (referring to ANASTOS) serious." The CS said that his contact's "biggest thing" was "making sure that you have the cash" and that he wanted to see "cash on hand." ANASTOS asked about the status of some paperwork, and then said, "I need to

know how much and I don't need details, but how is it going to be handled in regard because I'm very nervous it's going to come back to me."

30. According to the recording, ANASTOS said, "I want [Individual C, referred to by last name] out." The CS then asked ANASTOS why. ANASTOS explained, "He's the catalyst to this whole thing [lawsuit]. He's the one who keeps doing the citations [which I believe to be a reference to the citations issued in the Law Division case referenced above]. It's not [Individual B, referred to by first name]. I mean, it's [Individual B, referred to by first name]'s name there, but it's not [Individual B, referred to by first name]. He [Individual C] is the one who started all this shit. I'm 99 percent sure he's the one that has to do with the FBI." ANASTOS said, "This is [Individual C, referred to by last name] telling them to call, the State's Attorney, the DA, the DOJ. That guy needs to go." ANASTOS said, "Get rid of that motherfucker. He has no reason to exist. Period. He's already fucked up his family. He's fucking my family now. He's fucked my grandfather in the past. How much is that going to cost. And I don't need details, but." The CS said that ANASTOS was "looking at about 10 grand." ANASTOS replied, "Sure."

31. According to the recording, ANASTOS said, "I think [Individual C, referred to by last name] is the catalyst to get out of the picture. That clears up my accounts, I think, I think it would slow down [Individual B, referred to by first name] from doing anything further. It would maybe give him a little lightbulb moment, let's fucking sit down, these guys have gotten your decks clear, let's sit down, let's handshake." The CS replied that ANASTOS was thinking that after Individual C was "killed," Individual B would "come back to the table" to talk to ANASTOS, and that it made sense. ANASTOS said, "Give me some guidance. This is new to me. I looking to you for opinions and guidance." The CS said that it made sense if ANASTOS believed that

Individual C was the "catalyst," and ANASTOS said that he believed that Individual C was "pushing this."

32. According to the recording, the CS also raised the question of when the murder had to occur. ANASTOS said, "Before next Friday [October 7, 2016] or this is all not worth it."

33. According to the recording, the CS and ANASTOS discussed the possibility of ANASTOS borrowing money from the CS's family. ANASTOS said that he was "not going to go through with this unless I get some cash." ANASTOS said that if he were able to borrow "40," which I understood to be a reference to $40,000, he would take "10" to "the guy to take [Individual C, referred to by the last name] out of the picture."

### C. October 4, 2016 Meeting #1

34. On the morning of October 4, 2016, agents equipped the CS with an audio recording device and transmitter, which they activated. Agents then listened to the recording device as the CS went to meet with ANASTOS and saw the CS meet with ANASTOS first in a vehicle parked in a parking lot and then in a restaurant. After the meeting, at approximately 11:35 a.m., agents met with the CS, de-activated the recording device, and took the recording device back into their possession. The following is based on a review of the recording and a draft transcript of the recording.

35. According to the recording, the CS referred to a prior conversation and said, "You said that if you had [Individual C, referred to by last name] taken out, that alleviates a lot of your bullshit as far as finances go, correct?" ANASTOS replied, "Mmmhmm." The CS said, "Okay. As I told you before, our guy is waiting, and you are talking to me about collateral. What do you have for collateral?" ANASTOS said, "I was going to put my truck for collateral." ANASTOS

then asked whether the CS's family would loan money to ANASTOS and said that he needed a check from the CS's family "before I make that decision."

36. According to the recording, ANASTOS continued, "I haven't seen anything happen here, and I keep going above and beyond." The CS replied, "Okay, well, you came to me and you asked me to have somebody eliminated and I made the phone calls, my family made the phone calls, to figure out, to get a guy out here to do it. And now because your money is tied up, my guy gave you an out, to say put up something for collateral, jewelry, truck, whatever, whatever collateral we can get squared away right now, then you meet with the dude tomorrow, you guys hammer out the details and your problems could be alleviated within the next freaking two weeks. One to two weeks, they are all gone." ANASTOS replied, "You don't have to sell that, I just, I'm digging a deeper hole here."

37. According to the recording, ANASTOS discussed his financial situation and referred to himself as "completely fucked." ANASTOS then said, "Meet him tomorrow or meet him two weeks from now, does it really make a difference?" The CS asked whom ANASTOS was referring to, and ANASTOS replied, "Your guy." The CS replied that he did not know how long the hit man was going to be available. ANASTOS said, "I'm having one of those mental points. Where do I stop the bleeding now?" The CS asked, "What is the end game? What is the outcome of it? That's the thing." ANASTOS said, "I'm thinking about taking [Individual B, referred to by first name] and [Individual C, referred to by last name] myself and then eating a bullet when I'm done, and just let [Individual A] get the life insurance." The CS responded, "What did you just say to me?" ANASTOS replied, "I'm going to take the two of them out, in public, do

it in front of my fucking grandmother,[6] and then put a bullet in my own head. Fuck them. Then [Individual A] is good, house is paid up, kids are safe." The CS asked why ANASTOS thought ANASTOS' children were not safe now. ANASTOS replied, "If I go to jail, they ain't safe." The CS asked why ANASTOS thought he was going to jail. ANASTOS replied, "I mean because that is where this is all going if I don't get this closed."

38. According to the recording, later in the meeting, the CS referred to letting "my guy know" what ANASTOS had come up with. ANASTOS replied, "Let him walk, let him walk. I will take care of [Individual C, referred to by last name]." The CS asked, "So let him walk and you are going to take care of it?" ANASTOS replied, "Maybe we will revisit it in a few weeks if he is open." After a long pause, the CS said, "So you are pretty much telling me that if I come up with this dough, you will move forward with [Individual C, referred to by last name]?" ANASTOS replied, "Mmmhmm."

### D. October 4, 2016 Calls

39. Soon after the recorded meeting, at approximately 11:45 a.m., the CS received a telephone call from ANASTOS, which was recorded. Agents saw that the CS received the call on the CS's cell phone, and later determined that the number that the call was coming from was the number for ANASTOS' cell phone, which agents knew in part because they had seen on the CS's phone text messages sent by ANASTOS to the CS from the same number. During this call, ANASTOS asked the CS what would happen if he did meet with "this guy" and then it took weeks for ANASTOS to "free up this money." The CS replied that the CS would then talk to "him" and

---

[6] According to the recording, during this meeting, ANASTOS referred to Individual B as the new husband of ANASTOS' maternal grandmother.

could provide some money if necessary. ANASTOS said, "Okay," and then said, "I don't want something happening before these fucking titles and shit, these deeds and stuff are released because that would just queer the whole fucking thing." ANASTOS then asked the CS, "We're okay to talk on this phone, right?" The CS replied, "yeah," and said that he was using his "burner [code for a cell phone that would be kept on a temporary basis and that presumably would be more difficult to trace to the CS]." ANASTOS continued that after the deeds were transferred and some money was "put in there," Individual B "will come to the table when [Individual C, referred to by last name] is gone." Based on my knowledge of the investigation overall, including ANASTOS' subsequent statements to law enforcement, I believe that ANASTOS had decided to proceed with his plan to hire a hit man and was seeking to arrange for collateral to give the hit man.

40.     On October 4, 2016, at approximately 12:41 p.m., ANASTOS had another telephone conversation with the CS, which was recorded. During this call, ANASTOS used the same number that he had used for the call earlier that day, which was the number for a cell phone used by ANASTOS. In this conversation, ANASTOS said that he had "found the one for the dump trailer." The CS asked how much the dump trailer was worth, and ANASTOS said, "Every bit of five grand." ANASTOS then asked, "How is this going to go." The CS replied that ANASTOS would "sign it over to him. You're gonna keep the trailer obviously but you'll just sign it over to him. Once you make good on it, he'll give it to you back and all is well." Based on my knowledge of the investigation overall, including ANASTOS' subsequent statements to law enforcement, I believe that ANASTOS was confirming that he had identified collateral to give to the CS's hit man so that the murder would take place, with the understanding that ANASTOS would pay the CS's hit man and get back the collateral later.

### E. October 4, 2016 Meeting #2

41. On the afternoon of October 4, 2016, agents equipped the CS with a recording device and activated it. Agents then listened to the recording device as the CS went to meet with ANASTOS and saw the CS meet with ANASTOS around 5 p.m.

42. According to my contemporaneous review of the recording, ANASTOS provided the CS with the title to a trailer and created an open title on the trailer by signing it over while leaving the buyer information blank. ANASTOS also provided the CS with a bill of sale which showed that the trailer was worth approximately $5,000. The CS asked ANASTOS if ANASTOS understood that once this meeting was done, then the arrangement was final and that the killing would be done. ANASTOS said that was still what he wanted, and added that he wanted to see some pictures.

43. Law-enforcement agents then took ANASTOS as well as the CS into custody. Agents met with the CS, de-activated the recording device, and took the recording device back into their possession.

### F. Statements by ANASTOS

44. After being taken into custody by law-enforcement agents, ANASTOS was taken to an FBI office, processed, and read his *Miranda* rights. ANASTOS then waived his *Miranda* rights and agreed to be interviewed. The interview was recorded.

45. During the interview, ANASTOS said, among other things, that he took responsibility for trying to hire someone to kill Individual C (the attorney who filed complaints on behalf of Individual B). ANASTOS said that he had asked the CS to find someone to kill Individual C and that that was why he had given the title to the CS. ANASTOS said that he did not want to kill Individual B (his grandmother's new husband) but wanted to kill Individual C.

15

## V. CONCLUSION

46. Based on the above information, I respectfully submit that there is probable cause to believe that on October 4, 2016, at approximately 12:41 p.m., LYLE ANASTOS used a facility of interstate commerce, specifically, a cell phone, with the intent that a murder be committed in violation of the laws of the State of Illinois as consideration for a promise or agreement to pay anything of pecuniary value, in violation of Title 18, United States Code, Section 1958.

FURTHER AFFIANT SAYETH NOT.

JODY BLAU
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 5th day of October, 2016

Honorable Jeffrey T. Gilbert
United States Magistrate Judge